UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Daniel Dillon, | File No. 23-cv-162 (ECT/LIB) |
|     Plaintiff and Counter Defendant, | |
| v. | **OPINION AND ORDER** |
| Novel Energy Solutions L.L.C., *a Minnesota Limited Liability Company*, and Clifton D. Kaehler, *an individual*, | |
|     Defendants and Counterclaimants. | |

---

Charlie R. Alden, Gilbert Alden Barbosa PLLC, Burnsville, MN, for Plaintiff Daniel Dillon.

Patrick R. Martin and Colin H. Hargreaves, Ogletree Deakins, Minneapolis, MN; and Rachel B. Cowen and Jean Morrow Edmonds, McDermott Will & Emery LLP, Chicago, IL, for Defendants Novel Energy Solutions LLC and Clifton D. Kaehler.

---

Plaintiff Daniel Dillon is a former employee and part-owner of Defendant Novel Energy Solutions, LLC. When Dillon's employment with the company ended in September 2022, Novel purchased Dillon's ownership interest. In this case, Dillon claims that this buyout violated Novel's Operating Agreement and that, as a result, his ownership interest was significantly undervalued.

Dillon and Defendants have filed competing summary-judgment motions concerning the ownership-valuation issue. Defendants' motion will be granted, and

Dillon's motion will be denied.  The quantity of Dillon's ownership interest is no longer disputed, and, as a matter of law, Novel's buyout complied with the Operating Agreement.[1]

I[2]

Novel is headquartered in St. Paul; it develops land for solar infrastructure projects and constructs solar gardens and facilities.  Compl. [ECF No. 1-1] ¶ 5.  Novel hired Dillon as its general counsel on September 23, 2019, and he would serve in that role until his resignation on September 23, 2022.  *Id.* ¶¶ 7, 69; ECF Nos. 39-2, 39-7, 35-2.  During the hiring process, Kaehler told Dillon that equity in the company could be granted to him in connection with the position, but that details would be worked out at a later date.  ECF No. 39 ¶ 2.

By May 2020, Kaehler had granted Dillon a 0.5% equity stake in Novel.  ECF No. 39-1 at 1.  In connection with Dillon's review in January 2021, Kaehler granted Dillon another 0.1% in vested equity due to his job performance.  ECF No. 39-2.  Kaehler then notified Dillon on June 17, 2022, that he would be granted 1% equity—not including the 0.1% he received at his January 2021 performance review—for a total of 1.1% equity in

---

[1]   Dillon also asserts claims under the Family and Medical Leave Act ("FMLA") and the Minnesota Human Rights Act ("MHRA").  Defendants do not seek summary judgment against these claims at this time.  There is subject-matter jurisdiction over Dillon's FMLA claim.  28 U.S.C. § 1331.  The legal issues raised by Dillon's remaining ownership-interest claims are distinct from his FMLA claim.  Regardless, all of Dillon's claims are substantially intertwined; they arise out of his Novel employment relationship and would, if tried, depend on the same factually overlapping witnesses, testimony, and documentary evidence.  28 U.S.C. § 1367(a); *see Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988).

[2]   The facts are undisputed or described in a light most favorable to Dillon.  Fed. R. Civ. P. 56(a).

Novel. *Id.* At that time, 0.6% of his equity had vested, with 0.25% vesting upon the conclusion of his third full year of employment with Novel, and a final 0.25% vesting on the conclusion of his fourth year with Novel. *Id.*

Kaehler notified Dillon that he was being removed from his position as General Counsel on September 16, 2022—one week before his next round of equity was scheduled to vest. ECF No. 39-4. Kaehler told Dillon that due to "performance issues," he would be "transitioned" to a position as Director of Business Affairs, and that his responsibilities would shift to "'manag[ing] clients' and other general business matters." *Id.*; ECF No. 39 ¶ 6. Kaehler also told Dillon that his equity vesting would pause until Kaehler saw how Dillon performed in the new position. ECF No. 39 ¶ 6. Dillon submitted his letter of resignation from Novel on September 23, 2022. ECF No. 35-2.

Novel's Operating Agreement gives Novel the option to purchase the ownership (or "Membership") interest of an equity holder (or "Member") on the occurrence of a "Triggering Event." ECF No. 35-1 ("Operating Agreement") § 7.5. As relevant here, Section 7.5 of the Operating Agreement provides:

> **<u>Optional Purchase of Membership Interests</u>.** The Company shall have the option, but not the duty, to purchase the entire Membership Interest of a Member upon the occurrence of one or more of the following events ("Triggering Events"):
>
> (a) A Supermajority Vote is cast to force the sale of the Member's Units at a purchase price determined at the time the vote is taken, minus any set-offs allowed under Section 8.3 of this Agreement. . . . The purchase price with respect to Common Units received in exchange for invested capital shall be the greater of (i) the Member's invested capital for such Units, plus a 6% return to the extent not already realized by such Member, or (ii) the Book Value. *The purchase price for*

3

> all other Units shall be the Book Value of the Company multiplied by the Member's Percentage Interest as set forth in Schedule A, as amended.
>
> \*   \*   \*
>
> (d) Upon the separation of employment from the Company by the Member.
>
> Within ten (10) days of the occurrence of any Triggering Event specified above, except the Supermajority Vote to buy out a Member, the transferring Member shall give written notice thereof (the "Transfer Notice") to the Company and the other Members. If the Company has not received a Transfer Notice within ten (10) days of the Triggering Event, then the Company at any time thereafter may make a written inquiry of the Member to which the transferring Member shall respond in writing with all information concerning the Triggering Event as the Company may reasonably request, and the Company may deem the Transfer Notice to have been given on a date selected by the Company.

*Id.* There is no dispute that Dillon's equity consists of Common Units he was granted, not provided in exchange for invested capital. ECF No. 35 ¶ 3. The Operating Agreement provides different equity-valuation methods depending on the Triggering Event. Operating Agreement § 7.5. If the triggering event is a Supermajority Vote to force the sale of a member's units, the value of the membership interest is based on the company's "Book Value." *Id.* If the Triggering Event is a member's separation of employment, then the valuation method used is a stipulated value set by supermajority vote, which may then be challenged by the departing member with his own valuation performed by a licensed appraiser. *Id.* §§ 8.2, 8.4.

On December 30, 2022, Novel's board of governors adopted a resolution concerning Dillon's ownership interest. Relevant here, the resolution approved and adopted Dillon's

4

admission as a member of Novel and, "in exchange for his employment services to [Novel]," issued "up to 50,450 Voting Common Units . . . to Dillon, which represent[ed] approximately 1.1% of the outstanding Membership Interests of [Novel.]" ECF No. 35-3. The resolution also memorialized the occurrence of a "Supermajority Vote" cast to force Dillon's sale—and Novel's redemption—of Dillon's entire 1.1% membership interest. *Id.* Novel provided Dillon with a notice of redemption, ECF No. 35-4, and tendered a check for $34,531.55, which represented Novel's calculated book value for Dillon's 1.1% equity interest. ECF No. 35-5. Dillon rejected the payment, ECF No. 34-2, and brought this case.

Dillon asserts claims across ten counts. The claims fall in three categories: (1) In his FMLA (Count VII) and MHRA (Count VIII) claims, Dillon alleges that Defendants interfered with his leave rights and discriminated against him for exercising his rights and on account of his disabilities. As noted, the Parties' motions do not implicate these claims. (2) Dillon asserts several claims challenging Defendants' ostensible failure to credit Dillon's 1.1% ownership interest in Novel. To this end, Dillon asserts claims for breach of contract (Count I), breach of the duty of good faith and fair dealing (Count II), declaratory judgment (Count III), and breach of fiduciary duty (Count VI). (3) Finally, Dillon asserts claims challenging the validity of the Supermajority Vote and the calculation of the value of his ownership interest. To this end, Dillon asserts claims for a "buyout" under the Operating Agreement (Count IV) or, alternatively, a buyout under Minn. Stat. § 322C.0701 (Count V), specific performance under the Operating Agreement (Count IX), and a declaratory judgment (Count X). For relief, Dillon seeks various forms of damages, a declaration that he "is the owner of 1.1% equity in Novel," a buyout of his interest in

5

compliance with the Operating Agreement, and attorneys' fees and costs. *See* Compl. at 23, ¶¶ 1–8.

## II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id*. at 255. Courts take a "slightly modified" approach when, as here, multiple parties have moved for summary judgment. *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012). In resolving Dillon's motion, the record is viewed in the light most favorable to Novel and Kaehler, and in resolving Novel and Kaehler's motion, the record is viewed in the light most favorable to Dillon. *See id.* "[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits." *Young Am.'s Found. v. Kaler*, 482 F. Supp. 3d 829, 851 (D. Minn. 2020) (citations omitted), *vacated and remanded on other grounds* 14 F.4th 879 (8th Cir. 2021) (citation and internal quotations omitted).

The Parties narrowed the disputed issues through their briefing. The 1.1% quantity of Dillon's membership interest is no longer in dispute. In their opening brief, Defendants

argued that the December 30, 2022, resolution issuing "approximately 1.1% of the outstanding Membership Interests of [Novel]" to Dillon, ECF No. 35-3, rendered any claims he might assert regarding the quantity of his ownership interest moot. ECF No. 33 at 5–7 (citing *Already LLC v. Nike, Inc.*, 568 U.S. 85 (2013)). Leaving aside whether the December 30th resolution was unconditional and irrevocable in the relevant sense, *see Already LLC*, 568 U.S. at 93, Dillon did not oppose this argument in his briefing and confirmed at the hearing that he had abandoned Counts I, II, III, and VI. *See Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."). The same is true of Dillon's claim for a buyout under Minn. Stat. § 322C.0701 in Count V. Dillon did not oppose Defendants' motion with respect to this claim and confirmed his abandonment of it at the hearing. Therefore, to the extent it challenges Counts I, II, III, V, and VI, Defendants' summary-judgment motion will be granted on this basis.

That leaves essentially one issue for decision: Whether the buyout of Dillon's ownership interest complied with the Operating Agreement. The construction of an unambiguous contract is a question of law. *Bus. Bank v. Hanson*, 769 N.W.2d 285, 288 (Minn. 2009). "The plain and ordinary meaning of the contract language controls, unless the language is ambiguous," meaning that "it is subject to more than one reasonable interpretation." *Id.* (citations omitted).

To recap, under the Agreement, Novel has the option to purchase the membership interest of a member after a triggering event. Operating Agreement § 7.5. Two types of triggering events are relevant here: (1) a supermajority vote under Section 7.5(a) of the

7

Operating Agreement, which forces the sale of the member's units, and (2) the member's separation of employment from Novel. If § 7.5(a) is applied—as argued by Defendants—the purchase price of Dillon's units is the book value of the company multiplied by Dillon's percentage interest of 1.1%, and Dillon has no opportunity to contest the book value. If § 7.5(d) is applied—as argued by Dillon—the purchase price of the units is determined by Article VIII of the Operating Agreement, which uses "the most recently established Stipulated Value set prior to notice of the Triggering Event multiplied times the Member's Percentage Interest." Operating Agreement § 8.1. Stipulated Value is set by supermajority vote. *Id.* § 8.2. Use of this valuation method would allow Dillon to challenge the stipulated value by hiring a licensed independent appraiser. *Id.* § 8.4. "If that appraisal is 35% higher or lower than the stipulated value, the Company shall adopt said appraised value in place of the Stipulated Value for the purposes of purchasing the Membership Interest in question." *Id.*

Dillon's interpretation conflicts with the Operating Agreement's unambiguous terms. None of the Agreement's provisions state that once *one* triggering event occurs, that it is *the* controlling triggering event from then on. Rather, the Operating Agreement provides for "the occurrence of one *or more*" triggering events and provides a definite timetable in which the applicable valuation metric is active. *See* Operating Agreement §§ 7.5, 7.7, 7.8 (emphasis added). The application of the Operating Agreement's provisions is best demonstrated with a step-by-step approach.

Two triggering events took place in this case. First, Dillon resigned on September 23, 2022, which under the terms of § 7.5(d) was a triggering event. *See id.*

8

§ 7.5(d). Dillon then had ten days to provide Novel and the other members with a written transfer notice. *Id.* § 7.5 ("Within ten (10) days of the occurrence of any Triggering Event specified above, except the Supermajority Vote to buy out a Member, the transferring Member shall give written notice thereof (the 'Transfer Notice') to the Company and the other Members."). Dillon argues that his resignation letter on September 23, 2022, was, itself, a transfer notice. Pl.'s Mem. in Supp. at 6. If that is true,[3] then under the terms of the Operating Agreement, Novel had "an option for forty-five (45) days following the occurrence of" Dillon's resignation "to acquire the entire Membership Interest owned by [Dillon] at a price determined pursuant to Article VIII." Operating Agreement § 7.7. This forty-five-day period expired on November 7, 2022. Since Novel "fail[ed] to fully exercise its option within the specified period, then the remaining Members [had] an option for thirty (30) days, commencing the day following the date of expiration of the Company's option . . . to purchase the Membership Interest of [Dillon] at the price determined pursuant to Article VIII." Operating Agreement § 7.8. The remaining members did not exercise this option, and this period expired on December 7, 2022. *See id.* Novel was not required to purchase Dillon's membership interest at any point during this period, and no provision says that § 7.5(d) controls the valuation beyond this period's expiration. *See id.* § 7.5

---

[3]   It is not clear that Dillon's resignation letter qualifies as a transfer notice. His resignation letter does not mention triggering events. In it, he simply wrote: "Please be advised that as of the date hereof I hereby resign from my employment with Novel Energy Solutions L.L.C. Thank you for the opportunity." ECF No. 35-2. It was not until November 16, 2022—well past the 10-day deadline—that Dillon sent Novel a letter notifying it that his resignation on September 23rd had been a triggering event. *See* ECF No. 38-2 ("Dan Dillon submitted his letter or [sic] resignation on September 23, 2022. As you are aware, this qualifies as a Triggering Event.").

9

(stating that Novel "shall *have the option, but not the duty*, to purchase the entire Membership Interest of a Member upon the occurrence of one *or more*" triggering events) (emphasis added).

After the option period expired, the second triggering event took place when a supermajority vote was cast to force the sale of Dillon's equity units on December 30, 2022. Operating Agreement § 7.5(a) ("The Company shall have the option, but not the duty, to purchase the entire Membership Interest of a Member upon the occurrence of . . . [a] Supermajority Vote[.]"); ECF No. 35 ¶ 6; ECF No. 35-3; ECF No. 54; ECF No. 54-1. A supermajority vote "means the affirmative approval, whether taken at a meeting or by a written action, of both (i) seventy-five percent (75%) or more of the Voting Common Units, and (ii) thirty-seven and one-half percent (37.5%) of the Voting Members (a husband and wife will count as two Voting Members if both are active in the Company)." Operating Agreement at 4. Novel complied with these supermajority vote requirements, receiving consenting votes in excess of the Voting Common Units threshold and the Voting Members threshold. ECF No. 54 at 2. As a result, the relevant triggering event is Novel's December 30, 2022, supermajority vote. The proper valuation method for Dillon's membership units is thus "the Book Value of the Company multiplied by the Member's Percentage Interest." *See* Operating Agreement § 7.5(a). Novel then complied with the Operating Agreement by using the book value previously calculated by an independent third-party auditor on December 31, 2021, when issuing its check to Dillon. *Id.*; Operating Agreement at 2 ("Book Value shall be determined from the books and records of the

Company as of the last day of the fiscal year (the 'Determination Date') immediately preceding the fiscal year in which the Triggering Event occurs[.]").

Dillon argues that enforcement of § 7.5(a), rather than § 7.5(d) would fail to give effect to all the Operating Agreement's provisions.  He claims that Novel's interpretation would moot Section 7.7 of the Operating Agreement because it "gives Novel 45 days from the occurrence of a Triggering Event to 'acquire the entire Membership Interest owned by the transferor-Member at a price determined pursuant to Article VIII.'"  Pl.'s Mem. in Supp. [ECF No. 37] at 15–16.  Dillon omits the rest of that sentence to make it appear mandatory.  The Operating Agreement actually states: "The Company shall have *an option* for forty-five (45) days following the occurrence of a Triggering Event to acquire the entire Membership Interest . . . ."  Operating Agreement § 7.7.

Dillon rejects the idea of successive triggering events, arguing that Novel's preferred interpretation would  "mean Novel could to do [sic] exactly what it did here— ignore the occurrence of a Triggering Event, wait an indeterminate amount of time, and cast a Supermajority Vote to redeem a Member's interest at a price more favorable to Novel." Pl.'s Mem. in Supp. at 15.  He argues there can only be one triggering event at a time, lest conflicting and contradictory obligations arise.  *Id.* at 17.  The Operating Agreement does not, however, allow an indeterminate amount of time.  Instead, it provides for a forty-five-day option for the Company, and a thirty-day option for remaining members. Operating Agreement §§ 7.7, 7.8. Novel waited until this period ended.  There is no issue here of there being more than one active triggering event at any given time.

11

Finally, and more generally, Dillon argues that Minnesota Courts interpret a contract to give effect to all of its provisions, and do not construe terms to lead to a harsh or absurd result. Pl.'s Mem. in Opp'n [ECF No. 55] at 4–5 (citing *Emps. Mut. Liab. Ins. Co. v. Eagles Lodge*, 282 Minn. 477, 479 (1969)). This is true. *See Brookfield Trade Ctr., Inc. v. Cnty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998) ("We read contract terms in the context of the entire contract and will not construe the terms so as to lead to a harsh and absurd result."). That does not mean that unambiguous contracts will not be enforced. As the Minnesota Supreme Court has explained:

> The determination of whether a contract is ambiguous is a question of law, but the interpretation of an ambiguous contract is a question of fact for the jury. If a contract is unambiguous, the "contract language must be given its plain and ordinary meaning, and shall be enforced by courts even if the result is harsh."

*Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346–47 (Minn. 2003) (quoting *Minneapolis Pub. Hous. Auth. v. Lor*, 591 N.W.2d 700, 704 (Minn. 1999)) (internal citations omitted). Here, the Operating Agreement unambiguously provides that (1) there can be multiple triggering events, (2) the purchase-option window associated with a particular triggering event is time-limited, (3) Novel had no duty to purchase Dillon's membership interest following his resignation, and (4) after a supermajority vote to force the sale of a member's interest, the controlling valuation method is Novel's book value. Accordingly, these provisions will be enforced, meaning Dillon's claim in Count IV fails.

Dillon's claims in Counts IX and X fail for the same reasons. In Count IX, Dillon seeks a court order "directing Novel to purchase Dillon's membership units at the price

established by Article VIII of the Operating Agreement." Compl. ¶ 137. The purchase price provisions in Article VIII apply "[u]nless provided otherwise in this Agreement." Operating Agreement § 8.1. Section 7.5(a) expressly sets the applicable purchase price as the book value. *Id.* § 7.5(a). Similarly, in Count X, Dillon seeks a declaratory judgment "that Novel is required to buy Dillon's membership interest at the price established under Section 7.5(d) of the Operating Agreement rather than the price established under Section 7.5(a)." Compl. ¶ 141. As explained above, the Operating Agreement provides that the valuation method for Dillon's membership units is controlled by § 7.5(a).

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1. Plaintiff Daniel Dillon's Motions for Partial Summary Judgment [ECF No. 10 and ECF No. 47] are **DENIED**.

2. Defendants Novel Energy Solutions LLC and Clifton D. Kaehler's Motion for Partial Summary Judgment [ECF No. 31] is **GRANTED**.

Date: May 8, 2023                            s/ Eric C. Tostrud
                                             Eric C. Tostrud
                                             United States District Court